UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY WILKINS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) No. 4:22-cv-00428-SEP |
| | ) |
| ASCENSION LONG-TERM DISABILITY, | ) |
| PLAN, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Before the Court are the parties' motions for summary judgment, Docs. [40], [43]. For the reasons set forth below, Defendants' motion is granted in part, and Plaintiff's motion is denied. Defendants are entitled to summary judgment on Plaintiff's claim, but genuine issues of material fact preclude summary judgment on Defendants' counterclaim.

### FACTS AND BACKGROUND[1]

Plaintiff Kimberly Wilkins used to work as a nurse at St. John's Hospital in Warren, Michigan. Doc. [42] ¶¶ 14-15. St. John's is operated by Defendant Ascension Health Alliance. *Id*. ¶ 15. Around the start of the COVID-19 pandemic, Plaintiff stopped working because of her severe anxiety and depression. As an employee at St. John's, Plaintiff was covered by Ascension's Long-Term Disability Plan (LTD Plan), and she started receiving disability benefits. She remained out of work until February of 2021, when the LTD Plan administrator found that she was no longer disabled and cut off her benefits. After an unsuccessful appeal, Plaintiff filed this suit, alleging that Defendants unlawfully stopped her disability payments.

**I.    Defendants' Long Term Disability Plan**

The LTD Plan is governed by the Employe Retirement and Security Act (ERISA). *See* 29 U.S.C. § 1003. Defendant Ascension Health Alliance is the LTD Plan sponsor and administrator, but the Plan delegates discretionary authority to make claim determinations to a "Claims Administrator," Sedgwick Claims Management Services. Doc. [42] ¶ 4. As Claims

---

[1] The facts are drawn from the parties' statements of undisputed material fact and their responses to each other's statements. *See* Docs. [42], [45], [49], [51]. Those documents also refer to the Administrative Record, filed under seal at Docs. [26]-[32]. The Court will refer to the Administrative Record to clarify the facts when the parties provided qualified admissions or denials in their filings.

Administrator, Sedgwick has "the discretionary authority to decide all questions arising in connection with matters set forth in this Section 2.8." *Id.* ¶ 5.  The matters in Section 2.8 include "discretionary authority to determine whether a Participant is eligible to receive or to continue to receive a Benefit under the Plan and to compute the amount of such Benefit," "discretionary authority to make all claims determinations in accordance with Section 2.12 and 2.13 of this Plan," and "discretionary authority to interpret and construe all provisions of the Plan." *Id.* Sections 2.12, "Claim Procedure," and 2.13, "Claim Review Procedure," set out the procedures Sedgwick must use to process and review disability claims.  *See* Doc. [26] at 21-25.

The LTD Plan provides benefits to Ascension employees who qualify as disabled.  The LTD Plan defines "disabled" as:

> **1.12  Disability/Disabled** means that due to an Injury or Sickness which is supported by objective medical evidence,
>
>    (a)  the Participant requires and is receiving from a Licensed Physician regular, ongoing medical care and is following the course of treatment recommended by the Licensed Physician; and
>
>    . . .
>
>    (1)  the Participant is unable to perform:
>
>       (A)  during the first 24 months of Benefit payments or eligibility for Benefit payments, each of the Material Duties of the Participant's Regular Occupation[.]

Doc. [42] ¶ 6.  A participant's "Material Duties" are the "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted."  *Id.* ¶ 7.  And "Regular Occupation" means "the activities that the Participant regularly performed when the Participant's Disability began."  *Id.* at 8.

The LTD Plan places the burden of proving continued disability on the plan participant.  *See id.* ¶ 11.  "Proof means objective medical evidence, which in the discretion of the Claims Administrator, substantiates the existence of a Disability."  *Id.*  If the disability is the result of a mental illness, the LTD Plan requires that the mental illness be "certified and treated by a licensed psychiatrist."  *Id.* ¶ 12.

## II.   Plaintiff's Disability and the Initial Denial of Benefits

On March 27, 2020, Plaintiff stopped working after experiencing severe anxiety caused, at least in part, by the COVID-19 pandemic.  *See* Doc. [42] ¶ 17; Doc. [51] ¶ 17.  In early April, she was diagnosed with generalized anxiety disorder (GAD) and dysthymic disorder and began

treatment with a psychiatrist, Dr. Julie Sher, DO, and psychologist, Dr. Sebi Fishta, Ph.D.  Doc. [42] ¶¶18-19.  From March to September of 2020, Plaintiff was out of work while receiving treatment from Dr. Sher and a counselor, Ms. Laura Shoshi.  *Id.* at 20.  During that time, she was approved for and received short-term disability benefits from Ascension.  *Id.* at 21.  As the short-term disability benefits were running out in September of 2020, Plaintiff tried to return to work but could not because of her continued anxiety.  *Id.* ¶¶ 22-23.  She applied for long-term disability benefits, and, as required by the LTD Plan, Sedgwick requested objective medical evidence supporting her disability.  *Id.* ¶25.  Plaintiff provided information from two physicians, Dr. Sher and her primary-care physician, Dr. Michael Kenneson.  *Id.* ¶ 26.  After reviewing the medical information provided by Doctors Sher and Kenneson, Sedgwick found that Plaintiff could not safely do her job because of panic attacks, difficulty concentrating, limited focus, and impaired memory.  *Id.* ¶ 28.  Sedgwick approved Plaintiff's long-term disability benefits from September 23, 2020, to November 30, 2020, and informed Plaintiff that it would periodically request updates and medical notes to make sure remained disabled.  *Id.* ¶ 29.

In mid-October, Dr. Sher submitted a report to Sedgwick stating that Plaintiff could return to work on November 7, 2020.  *Id.* ¶ 31.  Based on that report, Sedgwick informed Plaintiff that her disability benefits would end on November 6th.  *Id.* ¶ 32.  Plaintiff responded that she could not yet return to work, so Sedgwick advised her that she needed to provide objective medical evidence to support her disability claim.  *Id.* ¶¶ 33-34.  Sedgwick allowed Plaintiff until after her next appointment with Dr. Sher to provide the evidence.  *Id.* ¶ 36.  On November 30th, Dr. Sher submitted a follow-up report to Sedgwick saying that Plaintiff was unable to return to work until February 15, 2021, but that her prognosis was good and she was compliant with the treatment plan.  *Id.* ¶ 37.  Accordingly, Sedgwick extended Plaintiff's long-term disability benefits to February 14, 2021.  *Id.* ¶ 38.

On February 2, 2021, Sedgwick reached out to Dr. Sher for an update on Plaintiff's disability.  *Id.* ¶ 39.  Dr. Sher did not respond, so Sedgwick told Plaintiff she needed updated evidence to confirm her disability by March 4, 2021.  *Id.* ¶ 40.  Dr. Sher responded on February 22nd, saying that Plaintiff was "unable to perform all and or any job functions due to flare ups." *Id.* ¶ 41.  Dr. Sher explained that Plaintiff had "[d]ifficulty concentrating, racing thoughts, worry, [and] lost concentration within 5-10 min in session."  Doc. [27] at 138.  Dr. Sher also noted that Plaintiff was compliant with her treatment and could return to work on May 25, 2021.  *Id.*  Along

3

with the February 22nd report, Dr. Sher submitted notes from a January 6, 2021, appointment.  *Id*. at 151.  On January 6, 2021, Dr. Sher had noted that Plaintiff's mood was "anxious," and that she had broken sleep, but Dr. Sher described her affect as "appropriate," her thought process as "logical/coherent," and the severity of her symptoms as "mild."  *Id.*

After receiving that response, Sedgewick reached back out to Dr. Sher to ask for more detail.  Doc. [42] ¶ 43.  Sedgwick asked Dr. Sher:  (1) "Please specify the abnormal clinical/diagnostic findings or treatment that is rendering the patient totally incapacitated"; and (2) "In light of the indication of the patient having flare-up episodes, would an intermittent leave be appropriate allowing the patient to work when not having flare ups?"  *Id*. ¶ 44.  Dr. Sher responded that "[t]he note of 1/6/21 indicates the observation of only that day which does not mean that the client feels this way every day," and "[n]o, the client would not benefit from intermittent leave."  *Id.* ¶ 45.

After reviewing the evidence, Sedgwick concluded that Plaintiff did not qualify for disability benefits after February 15, 2021.  *Id.* ¶ 46.  Sedgwick sent Plaintiff a denial letter on March 9th, explaining:

> Medical information from Dr. Sher indicates you remain off work due to generalized anxiety disorder and dysthymic disorder.  The disability form indicated you are unable to perform your job due to flare-ups.  You are being treated with medication management and psychotherapy.  The January 06, 2021 office note from Dr. Sher indicated you have anxious mood, your thought content is appropriate, your attention is intact and motor activity is normal.  You continue on Xanax and Paxil without adjustments.  The available medical information does not support clinical severity to preclude you from performing the essential duties of your own occupation as a Registered Nurse.  Consequently, as there is insufficient objective medical to support your inability to perform the material duties of your occupation, benefits February 15, 2021 through return to work have been denied.

*Id.* ¶ 48.

### III.   Plaintiff's Appeal

On August 10, 2021, Plaintiff appealed the denial of her disability benefits.  Doc. [42] ¶ 50.  The parties' characterizations of the evidence in the appeal differ, but the Administrative Record shows that Plaintiff submitted the following:

1. A chronology of Plaintiff's medical care from January 7, 2016, to June 30, 2021. Doc. [27] at 195-208.
2. Plaintiff's medical records.  *Id*. at 209-306.

3. A statement from Plaintiff explaining her symptoms and why she cannot return to work. *Id*. at 308-10. In addition to GAD and dysthymic disorder, Plaintiff stated that hypothyroidism, cervical radiculopathy, and migraine headaches contributed to her disability. *Id*.

4. A statement from Plaintiff's primary care physician, Dr. Kenneson, opining that Plaintiff "is not capable of performing the Material duties of her occupation as a registered nurse." *Id*. at 312.

5. A statement from Plaintiff's psychiatrist, Dr. Sher, opining that Plaintiff "is not capable of performing the Material duties of her occupation as a registered nurse." *Id.* at 432.

6. A statement from Plaintiff's counselor, Laura Shoshi, opining that Plaintiff "has significant cognitive deficiencies with concentration and memory that prevent her from performing the Material duties of her own occupation as a registered nurse." *Id*. at 511.

On August 24, 2021, Plaintiff was approved for disability benefits from the Social Security Administration (SSA). Doc. [42] ¶ 72. Plaintiff's counsel forwarded the SSA Notice of Award to Sedgwick as part of her appeal. *Id*. The SSA found that Plaintiff was disabled as of July 9, 2020, and entitled to benefits as of January 2021. Doc. [29] at 22. She received a lump sum payment of $11,544.75 in August of 2021, to cover her disability from January through July, and then monthly payments of $2,199.00 for each month after that. *Id*.

Sedgwick submitted Plaintiff's appeal to an independent review company where it was reviewed by five doctors.[2] Doc. [42] at 73. The doctors submitted reports outlining the evidence they reviewed and opining on Plaintiff's disability from the perspective of their specialties. Dr. Martin Lipschutz—board certified in psychiatry—concluded that the "records reviewed did not provide clinical information supporting the claim of functional deficits due to psychiatric illness from 2/15/21-[return to work] or any portion of the review period." *Id*. ¶ 74. Dr. Yuwei Gu—board certified in endocrinology, diabetes, and metabolism—completed a review "from the perspective of internal medicine" and found "functional impairment is not supported for the time from of 2/15/2021 through the claimant's return to work for headaches and neck spondylosis" and "there is insufficient support from the documentation provided that [Plaintiff's thyroid] condition may limit the ability to perform regular, unrestricted duties of the claimant's work." *Id*. ¶ 75. Dr. Michael Chilungu—board certified in neurology—concluded that "[b]ased on the

---

[2] Plaintiff "disputes the accuracy" of the independent medical examiners' findings but admits that they made the findings set forth in the Administrative Record and Defendants' Statement of Material Facts. *See* Doc. [51] ¶¶ 74-79.

5

available information, clinical evidence does not support functional neurological impairment during the period under review from 02/15/21 to [return to work]. *Id*. ¶ 76. Dr. Howard Grattan—board certified in physical medicine and rehabilitation—wrote that "from a Physical Medicine and Rehabilitation/Pain Medicine perspective, the claimant has not had functional impairments from 02/15/21-[return to work] or any portion of the review period that would affect her ability to perform the regular, unrestricted duties of her occupation." *Id*. ¶ 77. Dr. Tajuddin Jiva—board certified in internal medicine—explained "it is my opinion, that the claimant does not have any functional impairments, physical limitations, and/or restrictions from an Internal Medicine perspective from 02/15/21 to the [return to work]." *Id*. ¶ 78. The independent review company also had Dr. Gu conduct an additional review from "cumulative" perspective, i.e., considering the cumulative effect of Plaintiff's conditions. *Id*. ¶ 79. Dr. Gu found "[f]rom the perspective of internal medicine, I disagree with the treating provider, cumulatively functional impairment is not supported for the time frame of 02/15/21 through the return to work for headaches and neck pain/spondylosis." *Id*.

The five doctors that reviewed Plaintiff's appeal did not personally examine the Plaintiff. But Sedgewick did schedule an independent medical examination (IME) of Plaintiff with Dr. Jay Inwald, a psychiatrist. *Id.* ¶ 80. Dr. Inwald examined Plaintiff on October 27, 2021, and provided his written "Neuropsychological Evaluation" on November 17, 2021. *Id*. ¶ 81. Dr. Inwald's report shows that he conducted a diagnostic interview, gathered a psychosocial history, reviewed Plaintiff's medical records, and administered a "battery of tests designed to assess multiple domains of cognitive functioning."[3] Doc. [30] at 89-101. Dr. Inwald concluded, "From the specified date of February 15, 2021 Ms. Wilkins would have been able to return to work based upon cognitive and emotional functioning levels." *Id*. at 99.

On November 23, 2021, Sedgwick forwarded Plaintiff's counsel the reports from the independent reviewers and Dr. Inwald's evaluation to allow Plaintiff an opportunity to respond. *See* Doc. [30] at 103-11; Doc. [31] at 3-57. Plaintiff's counsel acknowledged receipt of those documents and requested "a copy of the Raw Data associated with Dr. Inwald's testing." Doc. [31] at 58. The Administrative Record shows that Plaintiff's counsel and a Sedgwick Appeal

---

[3] Plaintiff disputes "whether these tests were done; or whether they were done and scored correctly" because Defendants "refused to produce the test results from Dr. Inwald and refused to produce the raw data." Doc. [51] at 83. Plaintiff does admit to receiving Dr. Inwald's report, and, as discussed below, that is all she was entitled to receive.

6

Specialist discussed the process of getting the raw data from Dr. Inwald. *See id*. at 59-75. At one point, emails indicate that the company Sedgwick hired to coordinate the IME, Network Medical Review Co., would release the raw data to Dr. Sher. *See id*. at 62-63. For reasons that are not clear from the Administrative Record, however, Plaintiff never got the data. *See id*. at 84.

### IV.     The Appeal Denial and Defendants' Counterclaim

On January 3, 2022, Plaintiff's counsel informed Sedgwick that Plaintiff did not intend to offer a response to the independent reviews and IME. The next day, Sedgwick sent Plaintiff a letter denying her appeal and giving reasons for the decision. Doc. [42] ¶ 88. Plaintiff filed this lawsuit on April 13, 2022, claiming that Defendants' denial violated ERISA. *See id*. ¶ 92. On August 15, 2022, Defendants answered and filed a counterclaim. *See* Doc. [11]. Defendants allege that the LTD Plan required Plaintiff to reimburse Defendants after she received the lump-sum payment from the SSA. They claim that the disability benefit paid by the plan should have been reduced by the amount of the SSA payment for the months she received both sources of income. Defendants seek equitable relief under 29 U.S.C. § 1132(a)(3) in the form of an equitable lien and order directing Plaintiff to reimburse the overpayment. *Id*. at 9.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (alteration in original) (quoting *Wingate v. Gage Cnty. Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)). "A party asserting that a fact . . . is

7

genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013). But the "nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## DISCUSSION

Defendants are entitled to summary judgment on Plaintiff's claim. The Court must review Sedgwick's denial of benefits for an abuse of discretion. Under that lenient standard, the decision is reasonable and supported by substantial evidence. And there were no procedural irregularities in the claim processing to suggest an abuse of discretion. On Defendants' counterclaim, however, genuine disputes of material fact about the status of Plaintiff's SSA award preclude summary judgment.

**I.      The abuse of discretion standard of review applies.**

The baseline rule is that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.*, "a court should review the plan administrator's decision only for abuse of discretion." *McIntyre v. Reliance Standard Life Ins. Co.* (*McIntyre I*), 972 F.3d 955, 959 (8th Cir. 2020) (quoting *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 899 (8th Cir. 1996)).

The parties agree that the LTD Plan gives the Claims Administrator discretion. *See* Doc. [51] ¶ 4; *see also Butts v. Cont'l Cas. Co.*, 357 F.3d 835, 838 (8th Cir. 2004) ("The plan need not spell out in intricate detail who has the discretion, other than to specify that those charged with implementing it will have such discretion."). But Plaintiff argues that the "Court should apply the *Woo v. Deluxe Corp.* sliding scale standard of review to this case which is a less deferential standard of review." Doc. [50] at 3. In *Woo*, the United States Court of Appeals for the Eighth

8

Circuit held that to "obtain a less deferential review, [the plaintiff] must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." 144 F.3d 1157, 1160-61 (8th Cir. 1998) (citing *Buttram*, 76 F.3d at 900). The "Supreme Court's decision in *Metropolitan Life Insurance v. Glenn* abrogated at least the conflict-of-interest component of *Woo*." *McIntyre I*, 972 F.3d at 959 (citation omitted) (citing 554 U.S. 105 (2008)). And the Eighth Circuit recently clarified how that "sliding scale" applies to procedural irregularities.

The "sliding scale" is not a distinct standard that kicks in when a plaintiff demonstrates a serious procedural irregularity. It is a part of abuse-of-discretion review, "under which a procedural irregularity is one of many factors that a court should evaluate in determining whether there was an abuse of discretion." *McIntyre v. Reliance Standard Life Ins. Co.* (*McIntyre II*), 73 F.4th 993, 999 (8th Cir. 2023). The "sliding scale" abuse-of-discretion standard yields a two-part inquiry: (1) "consider first whether substantial evidence supports [the plan administrator's] decision," and (2) "then evaluate whether the procedural irregularities at issue in this case suggest an abuse of discretion." *Id*. at 1000. Courts will "reverse the plan administrator's decision only if it was arbitrary and capricious, meaning it was unreasonable or unsupported by substantial evidence." *Id.* (citing *Miller v. Hartford Life & Accident Ins.*, 944 F.3d 1006, 1010-11 (8th Cir. 2019); *Roebuck v. USAble Life*, 992 F.3d 732, 740 (8th Cir. 2021)).

**II.     The denial of benefits was reasonable and supported by substantial evidence.**

A claimant seeking to reverse a plan administrator's denial of benefits faces an uphill battle.[4] "A decision is reasonable 'if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.'" *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) (quoting *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009)). "Only when the evidence relied on is 'overwhelmed by contrary evidence' may the court find an abuse of discretion." *Whitley v. Standard Ins. Co.*, 815 F.3d

---

[4] The Court "reviews the claims administrator's final decision to deny a claim, rather than the initial denial that was reconsidered during the internal appeal." *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770-71 (8th Cir. 2001); *see also Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) ("We review [the administrator's] final claims decision, not the initial denial letter, to ensure development of a complete record.").

9

1134, 1142 (8th Cir. 2016) (quoting *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002)).

### A. Sedgwick's denial was not an abuse of discretion.

Sedgwick's job was to determine if Plaintiff was disabled after February 14, 2021. Sedgwick could have found that Plaintiff was disabled if she provided "objective medical evidence" that she could not perform the material duties of her regular occupation as a registered nurse. *See* Doc. [42] ¶¶ 6-8. After careful review of the parties' summary judgment briefing and the Administrative Record, the Court finds that Sedgwick's decision was reasonable and supported by substantial evidence. Sedgwick relied on six independent medical-record reviews conducted by five doctors from a range of specialties that covered Plaintiff's medical conditions. *See* Doc. [31] at 97. Each doctor reviewed Plaintiff's appeal and medical records. *See e.g.*, Doc. [28] at 609-11 (describing "Documents Submitted for Review"). They all concluded Plaintiff was not disabled and could perform her duties as a registered nurse. Sedgwick also relied on Dr. Inwald's neuropsychological exam. *See* Doc. [31] at 97. That exam appears to have been more thorough than any testing conducted by Plaintiff's treating physicians. After personally examining Plaintiff and conducting more than two dozen tests, Dr. Inwald concluded that Plaintiff could have returned to work on February 15, 2021. *See* Doc. [30] at 89-101. A reasonable person might have viewed the same evidence and arrived at a different conclusion. But the Court's role is limited to deciding whether Sedgwick abused its discretion, i.e., whether a "reasonable person *could* have reached a similar decision." *Ingram*, 812 F.3d at 634. A reasonable person certainly could have reached the same decision as Sedgwick.

### B. Sedgwick had the discretion to favor the opinions of its consulting physicians.

Plaintiff argues that Sedgwick abused its discretion by siding with the independent medical reviewers over Plaintiff's treating physicians. *See* Doc. [44] at 10; Doc. [50] at 9-10; Doc. [54] at 5-6, 8. Plaintiff claims that the "drastic contrast between the views [of those] who actually treated her/examined her, of those who only looked at her records, and the one examining neuropsychologist" show that Sedgwick's consultants were biased and "predisposed to reject the views of those who supported Mrs. Wilkins." Doc. [54] at 5. While Sedgwick's consultants disagreed with Plaintiff's treating physicians, there is no evidence of bias in the Administrative Record. And the Eighth Circuit has rejected the argument that an administrator abuses its discretion by favoring a reviewing physician's opinion over that of a treating

10

physician. "When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physician, the plan administrator has discretion to deny benefits unless the record does not support denial." *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir. 2006); *see also Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 662 (8th Cir. 2017) (same).

### C. Sedgwick did not improperly ignore or reject evidence of Plaintiff's disability.

Plaintiff next argues that Sedgwick "did not give adequate weight to Plaintiff's medical records" or her "subjective complaints and non-exertional limitations or to her favorable Social Security Award." Doc. [44] at 4. The Administrative Record clearly shows that Sedgwick considered Plaintiff's medical records in its decision. The appeal denial letter lists the records Sedgwick reviewed, and each of the consulting doctors reviewed Plaintiff's medical records. Doc. [31] at 87-91 (denial letter); Doc. [28] at 609-19 (Dr. Lipschutz); Doc. [29] at 31-37 (Dr. Gu); *id*. at 52-56 (Dr. Chilungu); *id*. at 70-76 (Dr. Grattan); Doc. [30] at 16-23 (Dr. Gu); *id*. at 38-42 (Dr. Jiva); *id*. at 91-93 (Dr. Inwald). Plaintiff may disagree with how Sedgwick weighed the evidence in those records, but it was not an abuse of discretion.

Nor did Sedgwick abuse its discretion by rejecting Plaintiff's subjective reports of her mental illness. Plaintiff argues it was "unreasonable to reject self-reported complaints with respect to an inherently subjective mental illness like depression and demand more 'objective' evidence." *See* Doc. [50] at 10. That argument ignores the terms of the LTD Plan, which required Plaintiff to provide "Proof of continued Disability satisfactory to the Claims Administrator." Doc. [42] ¶ 10. And the LTD Plan defines "proof" as "objective medical evidence, which in the discretion of the Claims Administrator, substantiates the existence of a Disability." *Id.* ¶ 11. Sedgwick was bound by the terms of the LTD Plan to consider only objective evidence.

Plaintiff cites several non-binding cases in which courts have found a denial of benefits unreasonable because of the plan administrator's rejection of "subjective" evidence. *See, e.g.*, *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546 (W.D. Pa. 2009); *Hopkins v. AT&T Umbrella Benefit Plan No. 1*, 2013 WL 12144078 (W.D. Mo. June 4, 2013); *Huberty v. Standard Ins. Co.*, 2008 WL 783407 (D. Minn. Mar. 25, 2008). The Eighth Circuit has "said that in some circumstances a plan administrator's insistence on objective medical evidence can be unreasonable." *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006). But "it is

11

generally 'not unreasonable for a plan administrator to deny benefits upon a lack of objective evidence.'" *Cooper*, 862 F.3d at 662 (quoting *Pralutsky*, 435 F.3d at 839). "This is especially so where, as here, the administrator has consistently specified the type of information sought, and the purpose is to substantiate the extent of the disability, rather than to question the diagnosis." *Id*. at 662. Sedgwick repeatedly informed Plaintiff and her treating physicians that it required "objective" evidence of her disability. *See, e.g.*, Doc. [27] at 44, 49, 53, 65, 72, 105, 137, 160. And the purpose was to substantiate the extent of her mental illness, not to question her diagnoses of GAD and dysthymic disorder. This is not a case in which the administrator unreasonably required objective evidence. The LTD Plan *required* Sedgwick to rely on such evidence. But even if it had not, Sedgwick's decision is supported by the opinions of the five reviewing consultants and Dr. Inwald's comprehensive examination.

As for the Social Security Administration's disability decision, the record is clear that Sedgwick considered the award during the appeal. The appeal denial letter explains, "Although, we have taken that information into account in making our determination, we are making a different decision than the Social Security Administration." Doc. [31] at 99. "Moreover, [Sedgwick] was not bound by the Social Security Administration's decision." *Rutledge v. Liberty Life Assurance Co. of Bos*., 481 F.3d 655, 660-61 (8th Cir. 2007) (citing *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) ("[A]n ERISA plan administrator or fiduciary generally is not bound by an SSA determination that a plan participant is disabled, even when the plan's definition of disabled is similar to the definition the SSA applied.") (alteration in original). Plaintiff's general claims that Sedgwick improperly weighed and ignored evidence are not enough to demonstrate an abuse of discretion.

### D. The objective evidence on which Plaintiff relies does not overwhelm the contrary evidence.

In addition to the general claim about the weight of evidence, Plaintiff points to specific pieces of objective evidence that she claims Sedgwick ignored. The Court will not go through every note from Plaintiff's treating physicians that she claims prove her disability. The Administrative Record shows that Sedgwick considered the medical records, and it had discretion as to how to weigh the records against the opinions of its consulting physicians. *See, e.g.*, Doc. [31] at 41 (Dr. Lipschutz's evaluation of Plaintiff's records from Dr. Sher, Dr. Kenneson, Dr. Fishta, and Ms. Shoshi); *id*. at 91-93 (Dr. Inwald's review of Plaintiff's medical records). But several of Plaintiff's arguments merit more detailed discussion.

First, Plaintiff argues that Sedgwick failed to consider objective proof of her mental illness by ignoring tests administered by her therapist, Ms. Shoshi. *See* Doc. [45] ¶¶ 15-19. Ms. Shoshi conducted a series of tests including the Montreal Cognitive Assessment (MoCA), Beck's Depression Inventory (BDI), Beck's Generalize Anxiety Inventory (BAI), and the Global Assessment of Functioning (GAF). *See* Doc. [27] at 55. The BDI and BAI results indicated a moderate level of depression and severe levels of anxiety. *Id*. at 57. And the GAF score indicated "severe symptoms as well as serious impairment in social and occupational functioning." *Id*. But Ms. Shoshi also reported that Plaintiff's "prognosis is good, given [she] is willing to comply with therapy and medication management." *Id*. at 58. Ms. Shoshi's testing and evaluation do not render Sedgwick's decision an abuse of discretion. Sedgwick was free to rely on the more thorough testing conducted by Dr. Inwald, who found that Plaintiff was not disabled. The tests and evaluation were also conducted almost a year before Sedgwick first denied Plaintiff's disability. In light of Ms. Shoshi's statement that Plaintiff's "prognosis is good," it would not be unreasonable for Sedgwick to find that Plaintiff's condition had improved by February 15, 2021, after almost a year of therapy and medication.

Second, Plaintiff argues that Sedgwick ignored the results of a Mental Status Exam and Minnesota Multiphasic Personality Inventory (MMPI) conducted by Dr. Sebi Fishta, Ph.D., from May of 2021. *See* Doc. [45] at 37, 49. The results of Dr. Fishta's report are mixed. The mental status exam described Plaintiff as follows:

> Associations are intact, thinking is logical, and thought content appears appropriate. Cognitive functioning and fund of knowledge is intact and age appropriate. Short and long-term memory appear to be mostly intact. Ms. Wilkins was alert and globally oriented. Her intellectual functioning is estimated to be in the average range. She was attentive with no gross behavioral abnormalities.

Doc. [27] at 470. But Dr. Fishta's diagnostic impression based on the MMPI results was that "Ms. Wilkins's profile suggests having a moderate-severe anxiety and depressive disorder" manifested by a variety of physical and psychological symptoms. *Id.* at 473. And Dr. Fishta believed that with cognitive behavioral therapy and psychotropic medication, she would "likely gain effective coping strategies to increase emotional stability and her personal wellbeing." *Id*. Dr. Fishta's mixed report is some evidence of Plaintiff's disability, but it does not overwhelm the contrary evidence on which Sedgwick relied.

Third, Plaintiff argues that Sedgwick ignored objective evidence of her migraines and neck pain. She points to a "detailed neurological exam" conducted by Dr. Kenneth Bottesi on June 18, 2021, showing "intractable migraines, underlying anxiety and depression, and a remo[t]e neck issue with C5-6 issues." Doc. [45] ¶ 38. The Administrative Record shows that Sedgwick considered Dr. Bottesi's examination in making its decision. *See* Doc. [31] at 96. And based on the Court's own review, the record is not overwhelming proof of a disability. Plaintiff saw Dr. Bottesi for an "Initial Consult." Doc. [27] at 224. In the history portion of the record, Dr. Bottesi notes that Plaintiff "has not tried things for her headaches in several years." *Id*. The "Neurological Examination" section of the record shows that Plaintiff had some "mild occipital nerve tenderness" and "some neck pain and posterior head pain when she extends her neck back," but her mental status examination, motor examination, reflexes, sensory examination, and coordination were normal. *Id*. at 225. Dr. Bottesi wrote that Plaintiff "has a *previous* remote neck issue" and "*may* have some C5-C6 issues." *Id*. (emphasis added). The record sets out a treatment plan for her migraines including "a headache diary to assess if she has intractable migraines." *Id*. Dr. Bottesi did not find that Plaintiff was disabled because of the migraines or neck pain, and it was not an abuse of discretion for Sedgwick to find otherwise.

In sum, Plaintiff provided some evidence that she was disabled after February 15, 2021. But the Administrative Record also includes persuasive evidence that she was not disabled. The Court will "not substitute [its] own weighing of the evidence for that of the administrator." *Cooper*, 862 F.3d at 661 (quoting *Gerhardt v. Liberty Life Assurance Co. of Bos.*, 736 F.3d 777, 780 (8th Cir. 2013)). On the lenient abuse of discretion standard, Sedgwick's decision was reasonable and supported by the evidence.

### III.     No procedural irregularities render the denial an abuse of discretion.

Having determined that denial was reasonable and supported by substantial evidence, the Court must consider "whether the procedural irregularities at issue in this case suggest an abuse of discretion." *McIntyre v. Reliance Standard Life Ins. Co.* (*McIntyre II*), 73 F.4th 993, 1000 (8th Cir. 2023). Plaintiff points to two procedural irregularities in Sedgwick's review of the claim and appeal: (1) "Defendant failed to take into account both Plaintiff's non-exertional limitations and complaints of pain and psychological symptoms"; and (2) "Defendant failed to produce tests and raw data from its retained neuropsychologist." Doc. [50] at 4. Neither allegation suggests an abuse of discretion.

### A. The alleged failure to consider some of Plaintiff's medical conditions is a disagreement about substance, not a procedural irregularity.

Plaintiff argues that her "complaints of pain and psychological conditions" were "ignored by all of Defendant's examiners." Doc. [50] at 5. Although Plaintiff characterizes the argument as a procedural irregularity, it is really a repackaging of her disagreement on the substance of Sedgwick's decision. And for the reasons explained above, that argument fails.

### B. Plaintiff was not entitled to the raw data from Dr. Inwald's examination.

Plaintiff argues that ERISA regulations require Defendants to provide the "raw data" and test results from Dr. Inwald's IME. *See* Doc. [44] at 10-11; Doc. [50] at 4-5. ERISA requires that, "[i]n accordance with regulations of the Secretary [of Labor], every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. The Secretary of Labor's requirements for a "full and fair review" are found in 29 C.F.R. § 2560.503-1(h). Because Plaintiff's claim was filed in March of 2020, see Doc. [45] ¶ 4, the 2018 amendments to the ERISA regulations apply to her claim. *See* 29 C.F.R. § 2560.503-1(p).[5]

> Under the 2018 amendments, a "full and fair review" requires that
>
> before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with **any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person)** in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date.

29 C.F.R. § 2560.503-1(h)(4)(i) (emphasis added). Plaintiff claims that she did not have the opportunity for a full and fair review because Sedgwick and Defendants refused to provide the "raw data" from Dr. Inwald's IME. She argues the raw data "was relied on in denying the claim, and was even created expressly for this case," so failure to produce it violates the "spirit and plain language of the amended regulation." Doc. [64] at 3, 5. Defendants contend that the 2018

---

[5] The parties did not discuss the 2018 amendments in their summary judgment briefing, so the Court ordered supplemental briefing on the application of those amendments to Plaintiff's arguments about the "raw data." *See* Doc. [60].

15

amendments do not entitle Plaintiff to the raw data because they did not consider, rely on, or generate the data, nor did they direct anyone else to do so. A sworn declaration from Sedgwick's Vice President of Operations attests to the same. *See* Doc. [63-1]. After consideration of the Administrative Record and that declaration, the Court agrees with Defendants.

A plan administrator is required to provide new evidence if the evidence was "considered, relied upon, or generated [(1)] by the plan, insurer, or other person making the benefit determination," or (2) "at the direction of the plan, insurer or such other person." 29 C.F.R. § 2560.503-1(h)(4)(i). Defendants claim, and the Administrative Record confirms, that neither Defendants nor Sedgwick "considered, relied upon, or generated" the raw data. Sedgwick considered and relied upon Dr. Inwald's report, but the data are not part of the Administrative Record. When Plaintiff's counsel requested the data, Sedgwick's Appeal Specialist reached out to Network Medical Review Co. (NMR)—the company it hired to coordinate the IME—and asked, "Are you able to send this to us?" Doc. [31] at 59. NMR responded that Dr. Inwald would "release the raw data of the testing to Kimberly's licensed psychologist," not to Sedgwick or Defendants. *Id.* at 61. Nothing in the Administrative Record suggests that Sedgwick ever received the raw data.

The question remains whether the raw data was "considered, relied upon, or generated . . . at the direction of" Sedgwick or Defendants. Defendants have shown that it was not. The Administrative record shows that Sedgwick hired an independent IME vendor, NMR, to coordinate IME. Doc. [30] at 60-63. NMR selected Dr. Inwald to conduct the IME. *Id.* at 64, 89. Sedgwick "did not direct Dr. Inwald, to run any particular tests or gather any specific data in conducting the evaluation." Doc. [63] at 2. The raw data "was generated by Dr. Inwald pursuant to his own process and medical determination, and not at the direction of Sedgwick." *Id.* The sworn declaration from Sedgwick's Vice President of Operations confirms that it did not receive the raw data from Dr. Inwald's testing and that Sedgwick does not direct IME providers to run certain tests or collect certain data. Doc. [63-1] at 1-2. Plaintiff does not point to any evidence in the Administrative Record to the contrary. Because Sedgwick and Defendants did not consider, rely on, or generate the raw data, or direct anyone else to do so, Defendants did not violate 29 C.F.R. § 2560.503-1(h)(4)(i). And the fact that Plaintiff never received the raw data is not a procedural irregularity.

**IV.     Genuine issues of material fact preclude summary judgment on the counterclaim.**

ERISA empowers a fiduciary to bring a civil action to "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). In *Sereboff v. Mid Atlantic Medical Services, Inc.*, the Supreme Court held that a fiduciary's action to enforce a reimbursement provision to collect funds from a settlement with third-party tortfeasors "qualifies as an equitable remedy because it is indistinguishable from an action to enforce an equitable lien established by agreement." 547 U.S. 356, 368 (2006). The Eight Circuit applied that reasoning to reimbursement for funds from the SSA in *Dillard's Inc. v. Liberty Life Assurance Company of Boston*, 456 F.3d 894 (8th Cir. 2006). The Eighth Circuit explained that the key to the Supreme Court's holding in *Sereboff* was the "determination that the third-party reimbursement provision 'specifically identified a particular fund, distinct from the [beneficiaries'] general assets—all recoveries from a third party . . . —and a particular share of that fund to which [the fiduciary] was entitled—that portion of the total recovery which [was] due [the fiduciary] for benefits paid." *Id*. at 901 (alterations in original) (quoting *Sereboff*, 547 U.S. at 364). Taking that analysis, the Eighth Circuit held in *Dillard's* that "Liberty's complaint states that it is a request for equitable relief, and Liberty seeks a particular share of a specifically identified fund—all overpayments resulting from the payment of social security benefits. Accordingly, Liberty's complaint constitutes a request for equitable relief . . . ." *Id*. at 901.

Defendants argue that "*Dillard's* made clear that the overpayments resulting from a favorable SSA award constituted a share of a specifically identified fund." Doc. [41] at 15. That is true, but the fact that a specifically identified fund existed at one time is not sufficient to make recovery of the funds an equitable remedy. Since the Eighth Circuit's decision in *Dillard's*, the Supreme Court has clarified "whether a plan is still seeking an equitable remedy when the defendant, who once possessed the settlement fund, has dissipated it all, and the plan then seeks to recover out of the defendant's general assets." *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 144 (2016). After reviewing "standard equity treatises," the Court concluded that "a plaintiff could ordinarily enforce an equitable lien only against specifically identified funds *that remain in the defendant's possession* or against traceable items that the defendant purchased with the funds (*e.g.*, identifiable property like a

17

car)." *Id*. at 144-45 (emphasis added). If the fund that is subject to the equitable lien—here the SSA payments—is dissipated on nontraceable items, the lien is eliminated. *Id*. at 145. "Even though the defendant's conduct was wrongful, the plaintiff could not attach the defendant's general assets instead." *Id*. At that point, a plaintiff's remaining remedies are legal, not equitable. *Id*. at 146.

Genuine issues of material fact remain about the status of Plaintiff's SSA payments. The parties agree that Plaintiff received an award letter from the SSA stating that she would receive a lump sum of $11,544.75 for back payments covering January through July of 2021. Doc. [42] ¶ 97. But they do not agree that the funds remain in Plaintiff's possession. *Id*. ¶¶ 98, 100. Defendants did not identify any evidence that shows whether Plaintiff kept her SSA award "separate from [her] general assets or dissipated the entire fund on nontraceable assets." *Montanile*, 577 U.S. at 151. The Court cannot grant summary judgment without information about "how much dissipation there was" and whether Plaintiff "mixed the [SSA award] with [her] general assets." *Id*.

## CONCLUSION

Defendants are entitled to summary judgment on Plaintiff's claim because the factual record shows that Sedgwick did not abuse its discretion by denying Plaintiff's disability benefits. Without more information about Plaintiff's SSA funds, the Court cannot grant summary judgment on Defendants' counterclaim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [40], is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** as to the claim in Plaintiff's First Amended Complaint. The motion is **DENIED** as to Defendants' counterclaim.

**IT IS FURTHER ORDERED** Plaintiff's Motion for Summary Judgment, Doc. [43], is **DENIED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 31st day of March, 2024.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE